2021 IL App (1st) 18-0996
No. 1-18-0996
Opinion filed March 31, 2021

FOURTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12 CR 21375 |
| ANTHONY JONES, | ) ) | The Honorable Dennis J. Porter, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justice Lampkin concurred in the judgment and opinion.
Justice Reyes dissented, with opinion.

**OPINION**

¶ 1        Defendant Anthony Jones was convicted, after a jury trial, of first degree murder in connection with the shooting death of Robert Blackman. Defendant was convicted under an accountability theory, while the actual shooter was acquitted by a separate jury. Defendant, who was 19 years old at the time of the offense, was sentenced to a total of 50 years with the Illinois Department of Corrections (IDOC). On this appeal, defendant raises one claim: that he was unconstitutionally sentenced to a *de facto* life sentence.

¶ 2    For the following reasons, we vacate defendant's sentence and remand for resentencing in light of *People v. Buffer*, 2019 IL 122327, and *People v. House*, 2019 IL App (1st) 110580-B.

¶ 3                                    BACKGROUND

¶ 4    In this appeal, defendant does not challenge either the sufficiency of the evidence against him or the admission of any testimony or exhibits at trial. Therefore, we summarize the facts established at trial.

¶ 5    The evidence at trial established that defendant and his codefendant, Jerome Moore, were attempting to rob a house where drugs were sold. On October 5, 2011, at 11:45 p.m., defendant and codefendant approached the front porch of the house where a group of men were seated. Defendant asked to buy marijuana, and two men then entered the house. Defendant and codefendant then drew weapons from the front of their pants and pointed them at the men remaining on the porch. When one of the men returned to the doorway with the drugs, he observed defendant with his gun drawn, yelled that they were being robbed, slammed the door, and ran to the back of the house. Defendant then entered the house, where Blackman was sitting in the living room with a 12-year old girl, watching television. Defendant grabbed the girl, wrapped his arm around her neck, and pointed a gun at her. Blackman knocked the gun out of defendant's hands, and the girl ran from the room. Blackman knocked defendant down and ran outside, where he and codefendant began struggling for control of codefendant's gun. The gun fired, killing Blackman.

¶ 6    Clinte Smith[1] testified that, after defendant was knocked down, he held defendant's head on the ground with his knee until defendant passed out. Antonio Smith testified that he

_____

[1]Since brothers Antonio and Clinte Smith share the same last name, we include their first names.

found defendant unconscious and sitting propped against the living room wall. Antonio Smith then hit the unconscious defendant 30 or 40 times in the head with a gun, while Devontae Dorsey beat defendant with a metal fan and Clinte Smith hit defendant with his knees. While the three men were beating the unconscious defendant, they heard the gunshots fired in front of the house that killed Blackman. Clydell Sistruck also testified that later on, after the shooting, he and the females in the house continued to beat defendant.

¶ 7 Police later recovered cocaine and cannabis from Antonio Smith's bedroom during a search of the house.

¶ 8 Defendant and codefendant were tried in a simultaneous trial to separate juries. Defendant's jury returned a verdict of guilty for the first degree murder of Blackman. Codefendant's jury found him not guilty of first degree murder.

¶ 9 After considering factors in mitigation and aggravation, the trial court sentenced defendant on April 11, 2018, to 35 years, plus an additional 15 years for being armed with a firearm, for a total of 50 years with IDOC. On April 11, 2018, defendant filed a notice of appeal, and this timely appeal followed.

¶ 10 ANALYSIS

¶ 11 In this appeal, defendant, age 19 at the time of the offense, claims that his 50-year sentence is excessive and unconstitutional under the eighth amendment of the United States Constitution, as well as the proportionate penalties clause of the Illinois Constitution.

¶ 12 "The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). In *Miller*, 567 U.S. at 465, the United States Supreme Court found that mandatory life without parole for offenders

3

under 18 years old violated the eighth amendment. The Illinois Supreme Court has since found that the reasoning of "*Miller* applies to discretionary sentences" as well. *People v. Holman*, 2017 IL 120655, ¶ 40; see *People v. Buffer*, 2019 IL 122327, ¶ 27 (*Miller* applies to juvenile life sentences, whether "mandatory or discretionary"). Our supreme court found that the key issue is not whether the sentence was mandatory or discretionary but whether a certain process was followed, namely, a sentencing hearing where youth and its attendant characteristics were considered. *Holman*, 2017 IL 120655, ¶¶ 37-38. In *Buffer*, 2019 IL 122327, ¶¶ 40-41, our supreme court clarified that for a juvenile, a *de facto* life sentence was a sentence that was more than 40 years long. Thus, an over-40-year sentence for an offender under 18 years old, whether mandatory or discretionary, violates the eighth amendment, if the trial court failed to specifically consider "some variant of the *Miller* factors." *Holman*, 2017 IL 120655, ¶¶ 40, 43-44.

¶ 13    However, offenders, such as defendant, who are 18 years old or older, cannot raise a facial challenge to their sentences under the eighth amendment and the *Miller* line of cases. *People v. Harris*, 2018 IL 121932, ¶¶ 59-61.

¶ 14    As a result, Illinois courts typically consider the sentencing claims of young adults under the proportionate penalties clause rather than the eighth amendment. *E.g.*, *People v. Minniefield*, 2020 IL App (1st) 170541, ¶¶ 37-38 (considering a 19-year-old defendant's as-applied sentencing claim under the proportionate penalties clause rather than the eighth amendment). "This is because federal cases have generally drawn a line at 18 years of age" and "because the [Illinois] proportionate penalties clause offers a broader path to the same types of relief." *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 51; see *People v. Savage*, 2020 IL App (1st) 173135, ¶ 61; *People v. Ross*, 2020 IL App (1st) 171202, ¶ 20.

4

¶ 15    Specifically, the proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art I, § 11. "The purpose of the proportionate penalties clause is to add a limitation on penalties beyond those provided by the eighth amendment and to add the objective of restoring the offender to useful citizenship." *Minniefield*, 2020 IL App (1st) 170541, ¶ 35; see *Franklin*, 2020 IL App (1st) 171628, ¶ 55; *Savage*, 2020 IL App (1st) 173135, ¶ 65. Thus, the proportionate penalties clause goes further than the eighth amendment in offering protection against oppressive penalties. *Minniefield*, 2020 IL App (1st) 170541, ¶ 35; see also *People v. Clemons*, 2012 IL 107821, ¶ 39; *People v. Fernandez*, 2014 IL App (1st) 120508, ¶ 63 ("the Illinois Constitution places greater restrictions on criminal sentencing than the eighth amendment's prohibition"). "Unlike other constitutional provisions affecting criminal defendants, these two provisions—the eighth amendment and the proportionate penalties clause—are not in lockstep." *Franklin*, 2020 IL App (1st) 171628, ¶ 55; see *Savage*, 2020 IL App (1st) 173135, ¶ 65.

¶ 16    In this appeal, defendant claims that his 50-year prison term was a *de facto* life sentence under *Buffer*, 2019 IL 122327. The State argues that his claim was forfeited by his alleged failure to raise this claim at sentencing. Defendant was sentenced on April 11, 2018, and the motion to reconsider his sentence was denied immediately after his sentencing, also on April 11, 2018. A year later, *Buffer* was decided on April 18, 2019. Defendant could not have raised a *Buffer* claim before *Buffer* was decided.[2] Therefore, he has not forfeited his claim.

---

[2]In addition, the State relies on *People v. Harris*, 2018 IL 121932, which was decided on October 18, 2018, six months after defendant's sentencing; and the defense relies on *People v. House*, 2019 IL App (1st) 110580-B, which was decided on May 16, 2019, and modified on June 27, 2019, over a year after defendant's sentencing.

¶ 17    As this court has stated before, we "do not mean to impugn the abilities or conscientiousness of the judge below." *People v. DiCorpo*, 2020 IL App (1st) 172082, ¶ 57. Rather, we are aware that the law regarding juvenile and young adult sentencing has been "a rapidly evolving area of the law, and the court below did not have the benefit of our supreme court's more recent cases in this area such as *Buffer* and *People v. Harris*, 2018 IL 121932, and our own recent cases," such as *House*, 2019 IL App (1st) 110580-B, and a now-long line of similar cases. *DiCorpo*, 2020 IL App (1st) 172082, ¶ 57.

¶ 18    When one considers the facts and evidence in this case, the finding is inescapable that this case is similar to *House* and requires the same outcome, which is a remand for resentencing.

¶ 19    In the case at bar, defendant was convicted of first degree murder solely under an accountability theory. During the attempted robbery of a house where drugs were sold, codefendant Jerome Moore shot and killed Robert Blackman. Defendant did not fire his gun and was knocked unconscious and beaten during the attempted robbery. Codefendant Moore, the shooter, who was tried jointly with defendant but before a separate jury, was found not guilty of murder and discharged.

¶ 20    At defendant's trial, a video depicted the crime scene, establishing that the shooting and murder occurred outside the house, while defendant was beaten inside the house, with his blood apparently spattered all over the interior walls and floor.[3] The parties stipulated that, if a forensic scientist was called to testify, he would testify that a swab from the blood on the floor matched defendant's DNA and not the victim's DNA. Photos taken in the hospital the

---

[3]During closing, the defense argued that Clinte Smith "says he beat [defendant] unconscious and we know he did because, you know, you saw the video this morning, there was blood all over, that was [defendant's] blood, he was knocked unconscious."

6

next day depicted defendant's badly beaten and bloody head. The State acknowledged in its rebuttal closing that they "beat the living hell out of" defendant and "splattered him on the walls and floor."

¶ 21    In our case, as in *House*, defendant was 19 years old. *House*, 2019 IL App (1st) 110580-B, ¶ 46. In our case, as in *House*, defendant was convicted solely under an accountability theory. *House*, 2019 IL App (1st) 110580-B, ¶ 29. Although the opinion in *House* stressed that defendant acted solely as a lookout, the *House* defendant was still armed, as was defendant in our case. *House*, 2019 IL App (1st) 110580-B, ¶¶ 7, 15.

¶ 22    The facts of the *House* case were far less sympathetic to the defense. First, the *House* defendant was convicted of not one, but two counts of first degree murder, plus two counts of aggravated kidnapping. *House*, 2019 IL App (1st) 110580-B, ¶ 4. In addition, in our case, defendant himself became a victim, since the trial testimony established that the occupants of the drug house, some of whom were convicted felons, continued to beat defendant even after he was unconscious. After the 19-year old defendant entered the house, he was knocked down, and Clinte Smith held defendant's head on the ground with his knee until defendant passed out. Shortly thereafter, Clinte's brother, Antonio Smith, observed defendant in the living room, sitting up against the wall, unconscious. Antonio Smith picked up defendant's gun and started beating the unconscious defendant in the head, face and mouth with the gun, while his nephew, Devontae Dorsey, beat defendant with a metal fan. Antonio Smith testified that he beat defendant so hard with the gun that he broke the gun, causing springs to fall out of the clip and that, if the police had not arrived, he would have killed defendant. Antonio Smith admitted that he sold drugs; and the police later recovered 69 bags of suspected narcotics from his bedroom. If the State had wanted to charge Antonio Smith, it certainly could have.

7

¶ 23    In *House*, "[a]fter considering the supreme court's decision in *Harris*, we \*\*\* conclude[d] defendant [was] entitled to a new sentencing hearing." *House*, 2019 IL App (1st) 110580-B, ¶ 32. In *Harris*, our supreme court did not consider the merits of the defendant's sentencing claim and found that the claim was more appropriate for another proceeding, such as a postconviction petition. *Harris*, 2018 IL 121932, ¶ 48; see also *House*, 2019 IL App (1st) 110580-B, ¶ 31 (discussing *Harris*). In *House*, this court observed that *Harris* was distinguishable because, first, "the defendant in *Harris* was the actual shooter, unlike defendant in the present case who was convicted under an accountability theory" —as was also the case here. *House*, 2019 IL App (1st) 110580-B, ¶ 32. In addition, in *House*, we found that the presentence investigation report (PSI) adequately established the defendant's prior criminal and family history, such as the fact that the *House* defendant never knew his father and did not graduate high school. *House*, 2019 IL App (1st) 110580-B, ¶ 63.

¶ 24    In the case at bar, the PSI established that defendant had a brief criminal history. Defendant had a prior conviction for criminal trespass to land, for which he received a fine, and a prior conviction for robbery, for which he received probation. He was on probation for that offense when this offense occurred.

¶ 25    The PSI also established defendant's horrific home life. Defendant was the only child born to his parents. He is the youngest of his mother's six children. He has four older sisters, who helped raise him, and an older brother, who had a drug habit and who abused and fought with one of his sisters. When defendant was a small child, his father was stabbed and killed by his mother, after the father struck the mother in her mouth with a bottle. Thereafter, the father's family had nothing to do with defendant.

8

¶ 26        As a child, defendant was abused and neglected and had to care for himself. His mother was a crack cocaine addict, and he grew up predominantly in Englewood, a community plagued by drugs, violence and gangs. While defendant was in kindergarten, his family had to move after their house was shot up as a result of his mother and her then-boyfriend selling drugs out of the house. During first grade, defendant was enrolled in his second elementary school. He resided with his maternal grandmother at the time while his mother was in rehab. During second and third grades, defendant lived with his mother and attended his third school until the family was evicted again. Defendant did not attend fourth grade at all because the district that he moved into said he did not live in that district. That year, he lived with friends. Defendant's next move was into another gang-riddled neighborhood where he had to fight to defend himself. Defendant started another school in fifth grade but in sixth grade his family was evicted again. Defendant attended other schools during seventh and eighth grades. During ninth and tenth grades, defendant attended Harper High School but had to repeat the tenth grade. While at Harper, he participated in wood tech and gymnastics and was a junior lifeguard. In the tenth grade, he was expelled for fighting.

¶ 27        Defendant left Chicago and went to Cedar Rapids, Iowa, where he tried to enroll in school, but he was denied enrollment. During that time, one of his cousins was murdered, and defendant "gave up on school."

¶ 28        Defendant's longest employment was sporadically doing plumbing work, putting in pools with a man named Russell. Defendant also worked for six months at Urban Development Solutions, earning commissions of $600 and up to $3500. The PSI also indicates that, at the time of sentencing, defendant had been going to counseling for four years in prison, twice a

week, to talk about his life and his case. Defendant reported that "it's been a big help for me." In all, defendant lived in 30 to 40 different homes and attended 10 different schools.

¶ 29        Defendant reported that, when his grandmother's boyfriend molested his sister, it broke up the family. When his mother was using crack cocaine, he lived with his aunt or by himself. Defendant, who was the youngest of his mother's six children, was raised primarily by his mother and his sisters. He described his sisters as "my queens" and stated he had a good relationship with them. Defendant claimed that, on the day of the offense, he went to the drug house to buy drugs, that he did not have a gun, and that they beat him with a gun.

¶ 30        Prior to sentencing, defendant filed a *pro se* motion alleging ineffective assistance of counsel; and during his allocution at sentencing, one of defendant's first statements was that he was still "arguing ineffective counsel." His statement went unaddressed at sentencing, and the trial court immediately proceeded to consider factors in aggravation and mitigation. The same attorney represented defendant at both trial and sentencing and filed the motion to reconsider sentence.

¶ 31        While considering factors in aggravation and mitigation, the trial court acknowledged that defendant's home life was "a nightmare," but the trial court did not then have the benefit of *Buffer*, *House*, or the *Buffer* line of cases.

¶ 32        As we did in *House*, we find that "a new sentencing hearing is the appropriate relief" for defendant's constitutional claims. *House*, 2019 IL App (1st) 110580-B, ¶ 72. In our case, as in both *Buffer* and in *House*, "the record does not need further development before advancing" to a new sentencing hearing. *House*, 2019 IL App (1st) 110580-B, ¶ 72 (discussing *Buffer*). At a new sentencing hearing, "both defendant and the State will have the opportunity

10

to fully explore defendant's argument and the evolving science on juvenile brain development." *House*, 2019 IL App (1st) 110580-B, ¶ 72.

¶ 33    We find that it makes no sense to deny defendant's claim now, only to see the same claim back again in a postconviction petition. *People v. Applewhite*, 2020 IL App (1st) 142330-B, ¶ 20 (citing *Buffer*, 2019 IL 122327, ¶ 47 (vacating the defendant's 50-year sentence and remanding for a new sentencing hearing "in the interests of judicial economy")). In the interests of judicial economy, and given the unique facts of this case, and in light of all the relevant cases decided since defendant's sentencing such as *Buffer* and *House*, we remand for resentencing now.

¶ 34    As a final note, we observe that this case bears little to no resemblance to *People v. Lusby*, 2020 IL 124046, ¶ 1, where our supreme court found no need for resentencing, although the trial court had imposed a discretionary life sentence in a pre-*Miller* case. In *Lusby*, before imposing sentence, the trial court found that the 16-year old offender was "depraved" with "absolutely no respect for human life." *Lusby*, 2020 IL 124046, ¶ 18. In *Lusby*, the evidence established that the 16-year old defendant had broken into a woman's home and "superficially incised" her "across her neck and sexually assaulted" her while she was still alive, and then killed her with an "execution-type gunshot wound to her forehead." *Lusby*, 2020 IL 124046, ¶ 4. Further, our supreme court observed that the defendant's prior criminal history was "extensive," including convictions for robbery and resisting a police officer. *Lusby*, 2020 IL 124046, ¶ 13. Lastly, a fellow inmate testified at sentencing that the *Lusby* defendant had beaten him for allegedly cutting in line for the telephone, resulting in broken bones and stitches. *Lusby*, 2020 IL 124046, ¶ 15. Finding no factors in mitigation and many in aggravation, the

11

trial court found that a life sentence was needed to ensure that the defendant's acts did "not occur outside of the Department of Corrections again." *Lusby*, 2020 IL 124046, ¶ 18.

By contrast, in the case at bar, the facts of the offense did not indicate irretrievable depravity. Defendant did not fire his weapon or injure anyone, while he himself was beaten. He had one bullet in his gun, which was found on the floor near where the spring and metal faceplate of the gun were found. Defendant's prior criminal history was minimal, with two adult convictions, for criminal trespass and robbery. Thus, the recent supreme court case of *Lusby* does not suggest a different outcome here.

¶ 35                                    CONCLUSION

¶ 36            In conclusion, we vacate defendant's sentence and reverse and remand for a new sentencing hearing. Since we vacated defendant's sentence, we do not address defendant's claim that it was excessive.

¶ 37            Reversed and remanded.

¶ 38            JUSTICE REYES, dissenting:

¶ 39            Defendant, who was one month shy of turning 20 years old at the time of the offense, was sentenced to 50 years' imprisonment. A sentence imposed by a trial court does not shock the moral conscience where the evidence demonstrates defendant planned the robbery and acted in concert with his codefendant, entered the residence with his loaded weapon drawn, held a 12 year old girl at gunpoint and threatened to shoot her in the head if his orders were not obeyed. Therefore, I respectfully dissent.

¶ 40            Defendant initially raises the argument that his sentence violates the eighth amendment. As the majority explains, it is now established in our case law that the categorical findings made by *Miller* and its progeny under the eighth amendment apply only to juveniles. *People*

12

*v. Harris*, 2018 IL 121932, ¶¶ 49-61 (rejecting a facial challenge under the eighth amendment to a life sentence for an offender over 18 years old but under 21 years old and conclusively noting, "the age of 18 marks the present line between juveniles and adults"); see *People v. Carrion*, 2020 IL App (1st) 171001, ¶ 28; *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 37; *People v. Handy*, 2019 IL App (1st) 170213, ¶ 37. Since defendant was one month shy of being 20 years old at the time of this offense, he cannot avail himself of the eighth amendment. See *id.*

¶ 41    Defendant also contends that his sentence violates the proportionate penalties clause of the Illinois Constitution. As set forth by the majority, this clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. A sentence violates the proportionate penalties clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Leon Miller*, 202 Ill. 2d 328, 338 (2002).

¶ 42    Given this standard, defendant's 50-year sentence in no way shocked the moral sense of the community or was cruel or degrading. Defendant, who was legally an adult at age 19 and 11 months, met Antonio Smith prior to the attempted robbery. Upon learning Antonio sold drugs, defendant and his codefendant planned to rob him. Thereafter, defendant and codefendant went to Antonio's location with loaded handguns. During their encounter, defendant raised his loaded weapon and pointed it at the individuals on the porch. Believing drugs to be inside, he then entered the residence where he wrapped his arm around a 12-year-old girl's neck, pointed his weapon at her, and stated to the other occupants in the apartment that he would shoot her in the head if he was not obeyed. Defendant's actions demonstrate a

13

clear intent to rob Antonio and to do so while armed with a loaded weapon. His actions further demonstrate that he was willing to place the lives of innocent individuals at risk in order to accomplish his goal. In *Buffer*, our supreme court recognized that the " 'hallmark features' " of youth are " 'immaturity, impetuosity, and [the] failure to appreciate risks and consequences.' " *Buffer*, 2019 IL 122327, ¶ 19 (quoting *Miller*, 567 U.S. at 477). The offense committed by defendant did not demonstrate any of these characteristics. The crime was not committed impetuously—it was deliberate—and the record reflects that the defendant did appreciate the risks and consequences of robbing a drug house—he brought the codefendant with him and both were armed with loaded firearms. Further, the deliberate nature of the offense is not indicative or reflective of someone who is acting in an immature manner. Moreover, at the time of this offense defendant was already on probation for robbery. While I acknowledge that he was not the principal who shot Robert Blackman, his role in this offense was not a passive one. In this way, defendant's sentence adequately represents his personal culpability, and the trial court did not abuse its discretion in sentencing defendant. See *People v. Snyder*, 2011 IL 111382, ¶ 36.

¶ 43 The majority analogizes this case to that of *People v. House*, 2019 IL App (1st) 110580-B, ¶ 32, *appeal allowed*, No. 125124 (Ill. Jan. 29, 2020). For various reasons, I find that *House* does not warrant a similar result in this case. First, the facts of *House* are distinguishable from the facts in this case. In *House*, the defendant, who had just turned 19 years old at the time of the offense, was convicted of two counts of first degree murder and aggravated kidnapping and the evidence established that he, while armed with a firearm, acted solely as a lookout and had no criminal background. *Id.* ¶¶ 33-34. The 19-year-old *House* defendant received two consecutive, mandatory life sentences for murder under an accountability theory to run

14

consecutively with two terms of 30 years for aggravated kidnapping. *Id.* ¶ 4. These mandatory life sentences were required by statute. *Id.* ¶ 46. In contrast, defendant here, while still guilty under an accountability theory, did more than act as a mere lookout. His actions demonstrated that the robbery was preplanned, executed with loaded weapons, and involved him entering the residence and holding a 12-year-old girl at gunpoint. *Cf. id.* ("There was no evidence that defendant helped to plan the commission but instead took orders from higher ranking [gang] members."). In addition, defendant was not sentenced to a mandatory life sentence, but to a discretionary one.

¶ 44        Second, I find the majority's reliance on *House*'s interpretation of *Harris* to be misplaced. The majority, citing *House*, contends that *Harris* is distinguishable because the defendant in *Harris* was the actual shooter, unlike the *House* defendant who was convicted under an accountability theory. Supra ¶ 23. According to the majority, this distinction, along with the fact the PSI adequately established the defendant's prior criminal and family history, played a role in whether the court could consider the merits of the defendant's sentencing claim. *Id.* I disagree and observe that a remand was not required because the *House* defendant had preserved his constitutional challenges when he raised them before the trial court in a motion to reconsider. *House*, 2019 IL App (1st) 110580-B, ¶ 32. Defendant here, however, has failed to preserve his constitutional claims for review.

¶ 45        To make a successful as-applied constitutional claim, a defendant must establish that a constitutional violation arose from an application of the statutory sentencing scheme to a specific set of facts or circumstances. *People ex rel. Hatrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶ 12. "Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *People v. Thompson*, 2015

15

IL 118151, ¶ 37. Reviewing courts cannot find an as-applied constitutional violation without an evidentiary hearing and findings of fact. *People v. Mosley*, 2015 IL 115872, ¶ 47 (quoting *In re Parentage of John M.*, 212 Ill. 2d 253, 268 (2004)). Defendant here did not raise a constitutional issue regarding his sentence before the trial court. Accordingly, the trial court had no opportunity to develop a factual record appropriate for an as-applied challenge.

¶ 46 Despite his failure to raise this constitutional issue below, defendant urges this court to consider his constitutional claims relying on *People v. Holman*, 2017 IL 120655, ¶ 32. According to defendant, the record is already sufficiently developed, and our consideration would promote judicial economy. I find defendant's reliance on *Holman* to be misplaced.

¶ 47 In *Holman*, the 17-year old defendant, for the first time on appeal, argued his life sentence was unconstitutional under *Miller v. Alabama*, 567 U.S. 460 (2012). *Holman*, 2017 IL 120655, ¶ 20. Our supreme court stated that ordinarily defendants must first present their constitutional claims to the trial court, but it acknowledged that there was a "very narrow exception" for an as-applied *Miller* claim where all the facts and circumstances needed to decide the claim were already in the record. *Holman*, 2017 IL 120655, ¶¶ 31-32 (citing *People v. Davis*, 2014 IL 115595, ¶ 43).

¶ 48 The court in *Harris* elaborated on this "very narrow exception." Similar to the case at bar, in *Harris*, the defendant was over the age of 18 when he committed the offense, and he argued that the court should extend *Miller* to his specific circumstances. *Harris*, 2018 IL 121932, ¶ 37. The defendant conceded that he raised his *Miller* claim for the first time on appeal but argued that under *Holman*, the court should consider his claim because the record contained enough information about his personal history to allow the court to decide whether

16

the evolving science on juvenile maturity and brain development relied upon in *Miller* applied to the defendant. *Id.* ¶ 42.

¶ 49     The *Harris* court distinguished the defendant's claim from the claim made in *Holman*: the defendant in *Holman* was 17 years old when he committed his crime, so, "[a]s a factual matter, the defendant in *Holman* fell squarely under *Miller* because he was a juvenile when his crime was committed." *Id.* ¶ 44. In other words, because defendant was a juvenile when he committed his crime, there was no question of fact as to whether the characteristics of juveniles, identified in *Miller*, applied to the defendant. *Id.* But the defendant in *Harris* was over 18 years old when he committed his crime, and our supreme court has not extended the rule announced in *Miller* to defendants ages 18 to 21. *Id.* ¶¶ 44, 54. Thus, *Miller* did not apply directly to the defendant's circumstances. *Id.* ¶ 45. Moreover, the record contained basic information about the defendant only. *Id.* ¶ 46. There was not enough factual development to determine whether *Miller*'s characteristics attendant with youth applied to defendant; therefore, the evidentiary record was not sufficiently developed to address the defendant's *Miller* claim. *Id.* ¶¶ 45-46.

¶ 50     Our supreme court reached a similar conclusion in *People v. Thompson*, 2015 IL 118151, ¶ 38. There, the defendant was 19 years old when he committed his crime, and he argued that the science that *Miller* applied to those who were under 18 years old when they committed their crimes also should be applied to those who were 18 to 21 years old when they committed their crimes. *Id.* The court found that the record did not contain any facts explaining why that science should be extended to those over 18 years old or why that science applied to the circumstances of defendant's case. *Id.* The court then reasoned that the trial

17

court was the most appropriate court to develop the facts needed to address defendant's as-applied claim. *Id.*

¶ 51 Unlike the defendant in *Holman*, defendant here was one month shy of 20 years old when he committed his offense. Therefore, defendant's circumstances do not fall squarely under *Miller* and *Holman*. See *Harris*, 2018 IL 121932, ¶ 44. Specifically, the record does not contain sufficient facts to explain why the science relied upon in *Miller* would apply to 18 to 21 year old defendants generally, or why it would apply to defendant's circumstances. See *id.* ¶ 46; *Thompson*, 2015 IL 118151, ¶ 38. In this way, *House* is again distinguishable from the case at bar. See *House*, 2019 IL App (1st) 110580-B, ¶ 32 (finding the defendant had "consistently challenged his mandatory natural life sentence in both his direct appeal and present postconviction petition" as well as in a motion to reconsider after his original sentencing).

¶ 52 Moreover, even assuming *Miller* principles applied, defendant had every opportunity at sentencing to present mitigating circumstances, including his youth. While the majority maintains that defendant and the trial court were without the guidance of *Buffer* and its progeny, defendant and the trial court were presumed to be aware of *Miller*, *Holman*, *Leon Miller*, and *Thompson*, all cases which have set forth the parameters under which a trial court is to consider a defendant's youth and its attendant characteristics during sentencing.

¶ 53 Based on this record, I would affirm the judgment of the trial court. At the sentencing hearing the trial court was aware of the contents of the PSI which indicated defendant stated his mother killed his father during a domestic violence incident. Additionally, defendant's mother could not maintain employment because she dealt with substance abuse issues, and, according to defendant, he lived in 30-40 different homes during his youth. The trial court in

18

fact acknowledged that defendant's home life "was pretty close to a nightmare." The PSI further indicated that defendant never belonged to a street gang but was a victim of gang violence, and defendant was bullied in school. Defendant left high school in the tenth grade. The trial court was also apprised of defendant's criminal history, that he was on probation for robbery at the time of the offense, and that he had been charged with aggravated battery of a correctional officer at the Cook County Correctional Facility while awaiting trial.

¶ 54    During the sentencing hearing, the trial court explicitly considered defendant's involvement in the offense: "I realize that you are not the one who killed the victim in this case, and I also realize it's quite possible and perhaps even probable that you did not intend for anyone to be killed ***." The trial court continued, "However, that's why these crimes are very serious, because those things happen." The trial court further informed defendant, "the evidence is clear that you are accountable; that is, responsible for the death of this individual, and the jury so found." The trial court considered defendant's conduct, including the fact defendant had been beaten unconscious, and it nevertheless found that defendant's involvement—where he entered a residence and held an adolescent at gunpoint—was very serious and led to Blackman's death. See *Willis*, 2013 IL App (1st) 110233, ¶ 123.

¶ 55    Based on this record, I find that defendant's sentence was not manifestly disproportionate to the nature of his offenses and therefore the trial court did not abuse its discretion. See *Jackson*, 375 Ill. App. 3d at 800. I further find that defendant's sentence does not shock the moral conscience so as to violate the proportionate penalties clause of the Illinois Constitution. It is for the reasons stated above that I would affirm the judgment and sentence of the trial court.

| | |
|---|---|
| **Cite as:** | *People v. Jones*, 2021 IL App (1st) 180996 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12-CR-21375; the Hon. Dennis J. Porter, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Stephen L. Gentry, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Sarah L. Simpson, and Brad Dickey, Assistant State's Attorneys, of counsel), for the People. |