2025 IL App (1st) 231152-U

No. 1-23-1152

Order filed March 18, 2025

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 21375 |
| | ) | |
| ANTHONY JONES, | ) | Honorable |
| | ) | Michael Clancy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's 40-year sentence for first degree murder over his contentions that it was excessive and violated the proportionate penalties clause of the Illinois Constitution.

¶ 2    Following a jury trial, defendant Anthony Jones was found guilty of the first degree murder

of Robert Blackman pursuant to an accountability theory. Defendant, who was 19 years old at the

time of the offense, was sentenced to 50 years in prison. On direct appeal, we vacated defendant's

sentence and remanded for resentencing. See *People v. Jones*, 2021 IL App (1st) 180996. On

remand, defendant was sentenced to 40 years in prison. Defendant now appeals, alleging that his sentence is excessive "and/or" violates the proportionate penalties clause of the Illinois Constitution. We affirm.

¶ 3    As defendant does not challenge the sufficiency of the evidence, we briefly summarize the evidence presented at trial.

¶ 4    At 11:45 p.m. on October 5, 2011, defendant and another individual approached a group of men on a porch and requested "weed." Defendant then entered the house with a firearm while the other individual pointed a firearm at the group on the porch. Inside the house, defendant encountered Blackman and a 12-year-old girl. Defendant "grabbed" her in a "choke-hold" and placed a firearm to her head. Blackman knocked the firearm from defendant's hand, left the house, and wrestled with the other individual. According to witnesses, that individual shot Blackman in the head. At the same time, defendant was beaten by multiple individuals.[1]

¶ 5    Defendant was found guilty of first degree murder under a theory of accountability and the trial court imposed a 50-year prison sentence. On appeal, we vacated the sentence in light of, *inter alia*, *People v. Buffer*, 2019 IL 122327, and remanded for resentencing. See *Jones*, 2021 IL App (1st) 180996.

¶ 6    On remand, an updated presentence investigation (PSI) report was prepared.

¶ 7    The PSI report related that defendant's mother killed defendant's father in self-defense during a domestic violence incident while pregnant with defendant. Defendant was raised by his mother, who had a drug problem, was involved with gangs, and sold drugs. During his childhood,

---

[1] Defendant and the individual who accompanied him to the house were tried simultaneously before separate juries. The other individual was acquitted.

defendant's family moved "a lot" and he sometimes slept on a couch. Defendant reported "a lot" of childhood trauma including being molested by his mother's boyfriend when he was three years old. He suffered physical, sexual, and emotional abuse at home and on the " 'streets.' " Between the ages of 6 and 14, defendant ran away several times and had "negative pressure" from his mother and the neighborhood. Defendant described himself as " 'pretty mature' " at the time of the offense, but stated that "so much" happening at home and outside home caused issues.

¶ 8     In high school, defendant was bullied, had old clothes, and faced gang issues. He described himself as an average student who got along well with teachers and some students and denied being diagnosed with a learning disability. He withdrew from school after a fight with a dean, but hoped to obtained a GED. Due to his mother's drug dealing and his old clothes, he got into fights and began " 'hustling and selling drugs.' " At the time of the updated PSI, defendant did not have regular contact with his mother, but tried " 'to love her.' " Defendant was close to his siblings, who provided "very strong support." Defendant's sister related that he was a " 'protector' " and served as a role model to his nieces and nephews.

¶ 9     Defendant's criminal history included convictions for criminal trespass to land and robbery. He first saw a mental health professional in 2012, and was diagnosed with anxiety and mood disorders. Between 2018 and 2020, defendant took psychiatric medication. Prior to his incarceration, defendant drank alcohol and used marijuana and ecstasy.

¶ 10     At the new sentencing hearing, the defense tendered a mitigation report, 13 character letters, the expert witness report of Dr. James Garbarino, and a white paper on the science of late adolescence.[2]

---

[2] As the judge who presided at trial retired, a different judge presided at the new sentencing hearing.

¶ 11    In aggravation, the State argued that defendant and his companion armed themselves in order to rob a drug dealer's home. During that incident, defendant entered the home and put a firearm to a 12-year-old's head. Blackman knocked the firearm from defendant's hand, ran outside, and was fatally shot by defendant's companion. According to the State, defendant's conduct in arming himself reflected preparation and the "deliberate nature" of the offense, not immaturity. The State discounted a proportionate penalties clause argument, arguing that punishment for this offense would not shock the moral sense of the community.

¶ 12    The State then read a statement from Blackman's family, which indicated that Blackman was 25 years old, "still growing up," and planned to be baptized. The State noted that at the time of the offense, defendant was on probation for a robbery conviction. Further, defendant had prison disciplinary tickets for fighting, property damage, disobeying a direct order, starting a fight, intimidation, unauthorized movement, and presenting a security threat.

¶ 13    In mitigation, defense counsel argued that the alleged shooter was acquitted and defendant had been beaten, receiving multiple fractured teeth, a fractured jaw, and blunt head trauma. Counsel further argued that no physical evidence linked defendant to the firearm that he allegedly carried, he made no inculpatory statement, and the trial testimony did not prove that he "concocted" the plan. Counsel further noted that the alleged shooter in this case, and the co-offenders in defendant's robbery case, were older than defendant.

¶ 14    Counsel posited that defendant's mother passed her own "trauma" onto her children and sold drugs for a gang, which caused the family home and the children to be shot at "often." Defendant's mother was "very tough" on her children, left them alone for extended periods of

time, and physically abused defendant to "toughen him up." When defendant was nine years old, his older brother and his brother's friend tried to have defendant participate in a rape.

¶ 15    During his childhood, defendant's family lived in "at least" 30 homes and he attended several schools, which disadvantaged him academically and made him a target for bullies. When defendant resided with his grandmother and aunt, he "flourished" and did well in school. However, defendant's mother always retrieved the children, which continued a cycle of violence, crime, abuse, and neglect. Defendant did not feel loved as a child and tried to impress his mother by using and selling drugs at a young age. Defendant was then "dragged" into gang life, although he tried to escape and ran away several times. When he was 15 years old, defendant moved to Iowa with a sister, and when he was 18 years old, he sold magazines in California. Defendant was "good" at sales, but was terminated after a disagreement with another salesman, his roommate, over hygiene.

¶ 16    Defendant attended high school and took GED courses in jail, where he also volunteered, was an "avid" reader, and attended counseling. Defendant previously used medication to manage his PTSD and anxiety, but preferred counseling, prayer, and exercise. Defendant was interested in sales, writing, and motivational speaking and wanted to contribute positively to his family and society. At the time of resentencing, defendant was 31 years old, the "man" of his family, and spoke to family members daily.

¶ 17    Counsel noted that Dr. Garbarino opined that adolescent brains were immature, that defendant's behavior at age 19 reflected that limitation, and that "severe adversity" compounded those limitations and increased the risk of antisocial and self-destructive behavior. The adversity defendant faced growing up could complicate his maturation and defendant's actions preceding the offense reflected his immaturity and impulsiveness. Defendant's behavior was partly due to

the impact of childhood in a "toxic social environment" where gangs and a "war zone mentality" were prominent. Counsel noted that defendant's score on a test which assessed adverse childhood experiences placed him at .01% of the population. Notwithstanding, according to Dr. Garbarino, past behavior during adolescence and young adulthood was not a predicator of future behavior, and brain maturity should not be presumed to be complete until the mid-20s. Despite defendant's experiences of adversity and this offense, he demonstrated maturity and "progress."

¶ 18    In allocution, defendant stated that he understood the magnitude of the situation, had sympathy for Blackman and his family, and understood "that [this] never should have happened." He stayed up at night thinking of the family members and 37 friends who died while he was incarcerated. During his incarceration, defendant talked to people about his past and had changed. He asked the court for a chance to go home.

¶ 19    The court noted the cause had been remanded for a new sentencing hearing where the evolving science of juvenile brain development could be fully explored. The court stated that it reviewed trial and posttrial transcripts, the PSI report, the mitigation report, the character letters, the expert report, and the white paper, as well as the statement from Blackman's family and defendant's prison disciplinary history. The court also considered the arguments in aggravation and mitigation, and defendant's history, character, attitude, and allocution.

¶ 20    Considering the factors in aggravation, the court noted that defendant threatened serious harm when he entered a house and pointed a firearm at a 12-year-old's head, and that his decision to arm himself was a cause, although "not the cause," of Blackman's death. In other words, defendant chose to arm himself and rob a "drug house" alongside another armed individual; defendant's "role in the offense was not a passive one." The court also noted that defendant had a

misdemeanor conviction for criminal trespass to land and was on probation for robbery at the time of this offense, and that the sentence in this case would deter others from committing similar offenses.

¶ 21    In mitigation, the court considered that defendant was not the shooter and did not injure anyone. The court also considered any intellectual disability or mental illness that defendant might have and the evolving science on emerging adult brain development as it applied defendant. The court considered Dr. Garbarino's opinion that adolescent brains were immature, particularly with respect to executive function and affective regulation, and that defendant's behavior in 2011 was shaped by these limitations. The court also considered Dr. Garbarino's opinion that severe adversity compounded the limitations of adolescent brains and increased the risk of antisocial and self-destructive behavior, and that defendant, a 19-year-old who experienced severe adversity, "exhibited a kind of 'adolescence squared.' "

¶ 22    The court noted that defendant's childhood was rough, violent, and lacked stable relationships with supportive adults. The court also considered that the Illinois Constitution required that all penalties be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship, and the time that defendant had already spent in prison. The court found that defendant's prison disciplinary record was "not perfect" but "not horrendous either." The court finally considered defendant's allocution and attempts to better himself.

¶ 23    The court imposed a 40-year sentence, consisting of  25 years for first degree murder and 15 years for being armed with a firearm. Defendant filed a motion to reconsider sentence, which the court denied.

¶ 24    On appeal, defendant contends that his 40-year sentence imposed for an offense that occurred when he was 19 years old is excessive "and/or" violates the proportionate penalties clause of the Illinois Constitution.

¶ 25    The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. When balancing "the retributive and rehabilitative purposes of punishment," the trial court must carefully consider "all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). Where a sentence falls within the statutorily mandated guidelines, it is presumed to be proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 26    When determining a sentence, "the trial court has broad discretionary powers." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A sentence within statutory limits will be deemed "excessive" and an abuse of discretion when it is "greatly at variance with the spirit and purpose of the law" or is "manifestly disproportionate to the nature of the offense." *Id.* at 210. When reviewing a defendant's sentence, this court will not reweigh the aggravating and mitigating factors and substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 50.

¶ 27    Here, defendant's conviction for first degree murder was subject to a sentence of 20 to 60 years in prison. 720 ILCS 5/9-1(a)(1) (West 2010); 730 ILCS 5/5-4.5-20(a) (West 2010). Moreover, because he was armed with a firearm he was subject to a 15-year sentencing

enhancement. 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2010). The 40-year sentence was within statutory guidelines, and is therefore presumptively proper. *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 28 Nevertheless, defendant contends that his sentence is excessive in light of the evidence in mitigation. Defendant argues that he experienced "extraordinary" abuse, neglect, and trauma during his childhood and adolescence, his actions surrounding Blackman's death were impulsive and immature, and he has "begun" to rehabilitate himself. Defendant acknowledges that the court considered his age and childhood trauma at sentencing, but asserts that his sentence does not reflect the "magnitude" of the mitigation evidence, which warranted the statutory minimum sentence.

¶ 29 Absent some indication to the contrary, other than the sentence itself, a reviewing court presumes the sentencing court considered all mitigating evidence presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. That presumption may be overcome by "affirmative evidence" that the sentencing court failed to consider factors in mitigation. *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 27. In this case, defendant has not identified such evidence.

¶ 30 To the contrary, the trial court specifically discussed the mitigation evidence when imposing sentence, including the mitigation report, the character letters, the expert report, the white paper, and defendant's allocution. The court noted that defendant did not injure anyone during the offense and tried to better himself in prison. The court also considered Dr. Garbarino's opinion that adolescent brains are immature, and that severe adversity compounds the limitations of adolescent brains and increases the risk of antisocial and self-destructive behavior. The court concluded that defendant, a 19-year-old who experienced severe adversity and a violent childhood without adult support, "exhibited a kind of 'adolescence squared.' "

¶ 31 However, the court was also mindful of the seriousness of the offense in that defendant's decision to arm himself with a firearm to rob a drug house was one cause of Blackman's death. Ultimately "the seriousness of an offense, and not mitigating evidence, is the most important factor in sentencing" (*People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11), and "the presence of mitigating factors neither requires a minimum sentence nor precludes a maximum sentence" (*People v. Jones*, 2014 IL App (1st) 120927, ¶ 55). Moreover, defendant's potential for rehabilitation was not entitled to greater weight than the seriousness of the offense. See *Wilson*, 2016 IL App (1st) 141063, ¶ 11.

¶ 32 Ultimately, defendant does not assert that the court failed to consider the mitigation evidence. Rather, he argues the mitigation evidence was not adequately considered and asks us to reweigh it and conclude that the statutory minimum sentence is warranted. This we cannot do. See *People v. Fern*, 189 Ill. 2d 48, 53 (1999) ("In considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently."). Based on the record before us, we cannot say the court's imposition of a 40-year sentence was an abuse of discretion. See *People v. Crenshaw*, 2011 IL App (4th) 090908, ¶ 24 ("The balance to be struck amongst the aggravating and mitigating factors is a matter of judicial discretion that should not be disturbed absent an abuse of discretion.").

¶ 33 We are similarly unpersuaded by defendant's argument that his sentence violated the proportionate penalties clause of the Illinois Constitution.

¶ 34 The proportionate penalties clause's emphasis on rehabilitative potential provides limitations on penalties beyond those afforded by the Eighth Amendment of the United States

Constitution. *People v. Clemons*, 2012 IL 107821, ¶¶ 39-41. However, the possibility of rehabilitation need not be given greater weight and consideration than the seriousness of the offense when determining a proper penalty. *People v. Hilliard*, 2023 IL 128186, ¶ 40. To succeed on a proportionate penalties claim, a defendant shows that the punishment for the offense is " 'cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community.' " *Id*. ¶ 20 (quoting *People v. Miller*, 202 Ill. 2d 328, 338 (2002)). Our supreme court has never defined what punishment meets this criteria because "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Miller*, 202 Ill. 2d at 339.

¶ 35    Our supreme court has recognized the potential viability of an emerging adult raising a proportionate penalties claim based on the reasoning of *Miller v. Alabama*, 567 U.S. 460 (2012). See *People v. Clark*, 2023 IL 127273, ¶ 87. In order to do so, a defendant must demonstrate that his or her own individual characteristics were so like those of a juvenile that imposition of a life sentence without the *Miller* safeguards was cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community. See *People v. Garcia*, 2024 IL App (2d) 210488-B, ¶ 14; see also *People v. Wilson*, 2022 IL App (1st) 192048, ¶ 87.

¶ 36    *Hilliard* is instructive. In that case, an 18-year-old defendant challenged the mandatory firearm enhancement imposed as part of his 40-year sentence in a postconviction proceeding. *Hilliard*, 2023 IL 128186, ¶¶ 11, 23, 27.

¶ 37    Our supreme court affirmed the dismissal of the defendant's as-applied proportionate penalties claim, noting that his sentence was discretionary and that, even with the mandatory enhancement, the sentence was less than the defined *de facto* life sentence for juveniles as stated

in *Buffer*. *Id*. ¶ 27. The court also noted that the legislature had determined that, while courts could use discretion regarding sentencing enhancements for those under age 18, leaving them mandatory for defendants age 18 or older reflected a deliberate choice, as did its decision to allow certain defendants who were under age 21 at the time of an offense to be eligible for parole review. *Id*. ¶¶ 38-39. The court concluded that the defendant's total sentence of 40 years was not arguably cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community when (1) the defendant did not receive a mandatory life sentence and (2) in light of the circumstances of the case where the defendant fired multiple shots at a victim at close range without provocation and in an attempt to kill him. *Id*. ¶¶ 28, 40.

¶ 38     Like the defendant in *Hilliard*, defendant's 40-year sentence is proportionate to his offense. First, defendant did not receive a life sentence. Second, he was not a juvenile when he committed the offense; rather, he was 19 years old. Third, the testimony at trial established that Blackman was fatally shot after defendant and another individual armed themselves and approached a home where drugs were sold, and defendant entered the home and placed a firearm to a 12-year-old's head. Fourth, at sentencing, the court specifically considered how defendant's adverse childhood affected his brain development at the time of the offense, and the growth toward rehabilitation that defendant exhibited throughout his incarceration. Therefore, we cannot agree that defendant's 40-year sentence was cruel, degrading, or so wholly disproportionate to his crime as to shock the moral sense of the community. *Id.*

¶ 39     We further note that because defendant was under 21 years of age on the date of the offense and his 40-year sentence was imposed after June 1, 2019, he is eligible for parole after serving 20 years of his sentence. See 730 ILCS 5/5-4.5-115(b) (West 2022).

¶ 40 Accordingly, defendant has failed to establish that his 40-year sentence violates the proportionate penalties clause of the Illinois Constitution.

¶ 41 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 42 Affirmed.