2021 IL App (2d) 191104-U
No. 2-19-1104
Order filed October 27, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18 CF 3183 |
| MARQUEST A. FRIAR, | ) ) | Honorable Robert Randall Wilt |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Zenoff and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The evidence at trial was sufficient for a rational trier of fact to find that defendant physically resisted a police officer beyond a reasonable doubt, defendant was not deprived of his right to a fair trial by the use of the instant jury instructions, and defendant's as-applied constitutional challenge as to his sentence is premature. Affirmed.

¶ 2    Following a jury trial, defendant, Marquest A. Friar, was convicted of aggravated vehicular

hijacking (720 ILCS 5/18-4(a)(4) (West 2018)) and resisting a police officer (720 ILCS 5/31-1(a)

(West 2018))[1]. The trial court sentenced defendant to 21 years' incarceration, which—because of the application of a mandatory firearm enhancement—was the minimum sentence he could have received. Defendant appeals, arguing: 1) that the State failed to prove beyond a reasonable doubt that defendant physically resisted a police officer; 2) that improper jury instructions deprived defendant of his right to a fair trial; and 3) that the imposition of a 15-year mandatory firearm enhancement violated the proportionate penalties clause as applied to defendant. For the below reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4      We summarize the relevant facts from the record on appeal. On January 3, 2019, defendant was indicted with aggravated vehicular hijacking and resisting a peace officer. On August 6, 2019, the matter proceeded to jury trial. Jonathan Hedges, an officer with the Rockford Police Department, testified that he had been working on the evening of December 6, 2018. After having been dispatched to the location of an aggravated vehicular hijacking, Officer Hedges learned that "a white Ford Fusion [was] taken during [a] hijacking." Officer Hedges later spotted the vehicle and followed it as it merged onto U.S. Route 20. He continued to follow the vehicle in his "marked Rockford police squad car," waiting to activate his siren until a backup officer arrived. In the interim, Officer Hedges was able to get close enough to the vehicle to make out "three subjects" inside.

---

[1] As defendant points out in his opening brief, the indictment erroneously charged him with resisting pursuant to 625 ILCS 5/31-1(a) (West 2018), which is actually a provision under the Boat Registration and Safety Act. However, all parties proceeded as if defendant was charged under 720 ILCS 5/31-1(a).

¶ 5    Backup eventually arrived, and Officer Hedges activated his overhead emergency lights and siren and attempted to initiate a traffic stop. The Ford Fusion did not pull over, but instead accelerated "and began to flee eastbound on [U.S. Route 20]," weaving in and out of traffic at "speeds in excess of 100 miles an hour," until the driver lost control and crashed into a utility box abutting an exit ramp. Officer Hedges pulled up alongside the crashed vehicle, where he saw an individual in the distance who was running away from the scene. After more officers arrived, Officer Hedges approached the Ford Fusion and observed defendant exit the vehicle's passenger side. Upon approaching defendant, Officer Hedges "told him to put his hands up." While issuing the command, Officer Hedges was wearing "[a] full Rockford police uniform" and the lights on the squad car were still activated.

¶ 6    After being asked to "show his hands," defendant did not raise his hands, but "slowly turned and walked away from [Officer Hedges]." Officer Hedges repeatedly told defendant to put his hands up. Defendant continued to walk away from Officer Hedges and "ended up getting down on his hands and knees on the ground" at the front passenger side of the vehicle. Officer Hedges testified he was unable to see defendant's hands. The officers at the scene continued "to tell [defendant] to show [them] his hands," but defendant persisted in his actions and did not raise his hands. Another one of the officers, Officer Bergstrom, "deployed his canine." Afterwards, the officers were finally able to secure defendant's hands and effectuate his arrest.

¶ 7    The State produced a video from Officer Hedges's dashcam that recorded these events and published the video before the jury. The video depicted the car chase, the crashed Ford Fusion, and defendant exiting from the vehicle, before turning away from police and obscuring himself on the ground behind the passenger side of the Ford Fusion. Once defendant obscured himself behind the vehicle, several officers can be seen moving in for the arrest.

¶ 8    While publishing the portion of the video in which defendant exited the passenger side of the Ford Fusion, the State asked Officer Hedges to elaborate on the footage. Officer Hedges responded, "I have him at gunpoint. We're telling him to put his hands up, show us his hands; and he's not complying."

¶ 9    On cross-examination, the following exchange took place:

"[DEFENSE COUNSEL]: When you yelled to [defendant], he turned slowly; correct?

[HEDGES]: Yes.

***

[DEFENSE COUNSEL]: You yelled for him to show his hands, correct?

[HEDGES]: Yes.

[DEFENSE COUNSEL]: You couldn't see his hands at that point.

[HEDGES]: No.

[DEFENSE COUNSEL]: And he dropped to his knees.

[HEDGES]: Yes.

[DEFENSE COUNSEL]: He was moving around a bit?

[HEDGES]: Yes.

[DEFENSE COUNSEL]: And you ran around the car, and you were looking at him; correct?

[HEDGES]: Yes.

[DEFENSE COUNSEL]: And you couldn't see his hands?

[HEDGES]: No.

¶ 10    Officer Hedges further testified that, after he ran around the car, he could tell that

defendant's hands were "near his waistband." He elaborated, saying that "when [defendant] first got down on the ground, he was crawling towards the [Ford Fusion] and away from us; and he wouldn't listen to our commands. After the canine was deployed, he started kicking the canine and continued to disobey our commands." Officer Hedges kicked defendant in the thigh, prompting defendant to finally place his hands behind his back.

¶ 11    On redirect examination, Officer Hedges testified that, before arresting defendant, he had received "information that the subjects were armed with weapons." This information had concerned Officer Hedges, particularly because of defendant's failure to show his hands. Officer Hedges was also concerned that defendant's hands were near his waistband, which is a "common area used *** to store a weapon."

¶ 12    Next, Kaycee Chiarello testified that, on the evening of December 6, 2018, she was driving her son's white Ford Fusion to the airport. Chiarello stopped at an intersection, where she was approached at her window by a male with a gun. The male, who was accompanied by two other males, ordered, "Give me everything you got." The second and third males opened her passenger and rear-side passenger doors. One of them attempted to grab Chiarello's car keys from the ignition. Chiarello told the group that she "did not have anything" for them to take. She put her hands up and attempted to walk away before one of the males struck her with a gun. Another one of the males appeared behind her with a gun and noticed that she was reaching for a cell phone. He alerted the other two and asked Chiarello, "What are you trying to do?" before hitting her right arm. Chiarello was able to get out of the car and ran away from the vehicle. As the three males got into her car, one yelled, "Merry Christmas, bitch," before the group drove off. Chiarello later identified defendant's two codefendants as the men who approached her window and passenger side door. She was unable to identify defendant as the male who had been behind her with a gun,

as she did not have a clear look at his face at the time of the offense.

¶ 13    Carl Bergstrom, another officer with the Rockford Police Department, testified that he too was on duty on December 6, 2018. After being dispatched to the location of the carjacking, Officer Bergstrom saw a white Ford Fusion in the area and recognized it as the vehicle that was reported to be stolen. After spotting the vehicle, he notified his dispatch of its location before losing sight of the vehicle. Afterwards, Officer Hedges used the police radio to advise Officer Bergstrom that he had located the subject vehicle towards U.S. Route 20. Officer Bergstrom headed towards Officer Hedges's location to assist him. After catching up with Officer Hedges, Officer Bergstrom activated his emergency lights and siren as the two officers neared the vehicle. They pursued it as it sped away and subsequently crashed. Officer Bergstrom and his canine partner arrived at the crash scene shortly after Officer Hedges. Officer Bergstrom saw defendant leave the passenger side of the vehicle, prompting him and Officer Hedges to "repeatedly" tell defendant to show them his hands and to get on the ground.

¶ 14    Officer Bergstrom testified that defendant did not show the officers his hands. Instead, he slowly walked away from them towards a nearby sign that was perpendicular to the Ford Fusion. The officers continued to command defendant to show his hands and get on the ground. Defendant "went to his knees in front of the front passenger tire, but still *** was not showing his hands." Fearing for the officers' safety, Officer Bergstrom deployed his canine partner to help detain defendant. Defendant "went down to his stomach" with "his head and upper body right next to the *** front passenger tire." There, "he brought his hands around and was kind of hitting [the] canine partner in his mouth/face area." After hitting the canine, defendant "went back to bringing his *** hands underneath his body[,] where [Officer Bergstrom] couldn't see them." Officer Bergstrom testified that, at that moment, the assisting officers were able to finally get defendant's arms behind

his back to effectuate his arrest. Officer Bergstrom searched around the vehicle after defendant was placed in handcuffs and located a "black Taurus 9-millimeter handgun *** tucked right behind the front passenger wheel," near where defendant had earlier crouched down. On cross-examination, Officer Bergstrom testified that he was unaware whether the firearm he recovered was tested for fingerprints.

¶ 15    Duane Johnson, another officer with the Rockford Police Department, testified that he also was on duty the evening of December 6, 2018. Like Officers Hedges and Bergstrom, he became aware of a call that evening regarding a vehicular hijacking and learned that the suspects were traveling eastbound on U.S. Route 20, towards his current location. Officer Johnson "posted up," waiting for the hijacked vehicle to reach him. Once it did, he received a call from other officers indicating that "they tried to stop the vehicle, and [that] it was fleeing from them." Officer Johnson joined the other officers in pursuing the vehicle and activated his marked squad car's emergency lights.

¶ 16    Officer Johnson testified that he reached the crashed vehicle shortly after Officers Hedges and Bergstrom. As Officer Johnson approached the front of the crashed car, he observed "[defendant] *** exiting the vehicle[,] *** and [defendant] started looking around, and then he went down out of sight for a moment while the other officers were approaching him." Officer Johnson testified that, when he lost sight of defendant, he could tell that defendant was by the front passenger side of the Ford Fusion. Officer Johnson yelled to defendant, "Show your hands. Show your hands. Lay on the ground. Show your hands." However, defendant never showed the officers his hands. Officer Johnson began approaching defendant along with the other responding officers, but defendant continued to disobey the officers' orders. Officer Johnson elaborated, "[H]e was right towards the front quarter panel by the tire, *** and we couldn't see him. We were giving

commands. He wasn't following our direction[s]." Officer Johnson testified that, after Officer Bergstrom deployed his canine partner, defendant "struggled with the dog for a brief moment."

¶ 17 Prior to deliberations, the jury was provided with the following instructions regarding the offense of resisting a peace officer:

"A person commits the offense of resisting a peace officer when he knowingly resists the performance of any authorized act within the official capacity of one known to him to be a peace officer.

To sustain a charge of resisting a peace officer, the State must prove the following propositions:

*First Proposition*: That Officer Hedges was a peace officer; and

*Second Proposition*: That the defendant knew Officer Hedges was a peace officer; and

*Third Proposition*: That the defendant knowingly resisted the performance by Officer Hedges of an authorized act within his official capacity.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

The language for these instructions was derived from Illinois Pattern Jury Instructions, Criminal, No. 22.13 (approved May 4, 2018) (hereinafter IPI Criminal No. 22.13). However, the parties agreed that IPI Criminal No. 22.13 should be modified to remove any reference to the word

"obstructing," as defendant was only charged with resisting a peace officer, not resisting or obstructing a police officer.

¶ 18    The jury found defendant guilty of aggravated vehicular hijacking and resisting a peace officer. The Winnebago Adult Probation Division completed its presentence report concerning defendant's background. The report indicated that as of the date of his underlying offenses, defendant was less than one month from becoming 19 years old. On November 5, 2019, the trial court denied defendant's motion for a new trial.

¶ 19    On November 26, 2019, the matter proceeded to sentencing. The trial court noted that it had reviewed the victim's impact statement, defendant's presentence report, and "the factors in aggravation and mitigation." The court remarked that the "biggest statutory mitigating factor" was defendant's age, as he was only 19 years old at the time of sentencing. The court also discussed other mitigating circumstances, such as defendant's family life, the fact that defendant was expecting a child, and that he had been working before he was arrested. The trial court commented on certain aggravating factors, such as defendant's criminal record, which was "one of the smallest [he had] seen," but was nonetheless "bad." The court discussed defendant's previous convictions, two of which were felonies. The court further acknowledged that all three of defendant's prior convictions involved firearms. The trial court also noted that one of defendant's co-defendants had received a relatively brief sentence as a result of a plea deal:

> "The long and short of it is[,] I'm mindful [the co-defendant] got less because of an agreement where weapons were removed, a codefendant who was more involved than [defendant]. So I see no reason whatsoever to give him any more than the statutory minimum.
>
> And if I had the ability, I would give him less than the statutory minimum, but I

don't."

¶ 20    The trial court sentenced defendant to one year's incarceration for the resisting-a-peace-officer conviction, with credit for time already served. For the aggravated-vehicular-hijacking conviction, the trial court sentenced defendant to 21 years' incarceration, representing the minimum allowable sentence after the imposition of a mandatory 15-year firearm enhancement.[2] Defendant timely appealed.

¶ 21                                    II. ANALYSIS

¶ 22    Defendant makes three arguments on appeal. First, defendant argues that because the State presented no evidence that defendant physically resisted any peace officers by "[f]ailing to [s]how [h]is [h]ands or [g]et on the [g]round," the State failed to prove defendant guilty of resisting a peace officer beyond a reasonable doubt. Second, defendant argues that he was deprived of a fair trial because the jury was not provided with a clear definition of the term "resisting." Third, defendant argues that the trial court's imposition of the mandatory 15-year firearm enhancement was unconstitutional as applied to defendant. For the below reasons, we reject these arguments and affirm.

¶ 23                          A. Sufficiency of the Evidence

¶ 24    First, despite defendant's contentions, the evidence adduced at trial could allow a rational trier of fact to find that defendant resisted a peace officer beyond a reasonable doubt.  "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*,

---

[2] The record indicates that prior to trial, the State made a plea offer to defendant, whereby defendant would have received a 20-year sentence for the underlying offenses, without the imposition of the firearm enhancement. However, defendant rejected the offer.

2017 IL 120958, ¶ 35. When confronted with a challenge to the sufficiency of the evidence, a court of review should not attempt to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Instead, the relevant question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 25　Pursuant to the Criminal Code of 2012 (Code), there are three essential elements that the State must prove in establishing that a defendant resisted a peace officer: 1) that defendant knowingly resisted a peace officer; 2) that the officer was performing an authorized act in his or her official capacity; and 3) the defendant knew that the officer was a peace officer. 720 ILCS 5/31-1(a); See *People v. Pruitt*, 166 Ill. App. 3d 679, 683 (1988) (State proved all elements of resisting a peace officer where the defendant knowingly kicked a police officer, while the police officers were lawfully effectuating the defendant's arrest, and where the defendant was aware that the arresting officers were police officers).

¶ 26　Section 31-1(a) of the Code contains "two separate prohibitions, 'resist' or 'obstruct.' 'Resist' is defined as 'to withstand the force or the effect of' or the exertion of 'oneself to counteract or defeat.' " *People v. Baskerville*, 2012 IL 111056, ¶ 25 (citing Webster's Third New International Dictionary 1932 (1961)). As such, the term "resist" presupposes "some type of physical exertion in relation to the officer's actions." *Id.* Therefore, to sustain a conviction for resisting a peace officer, the State must show that a defendant *physically* acted to resist a peace officer. *Baskerville*, 2012 IL 111056, ¶ 25.

¶ 27　Relying on *Baskerville*, defendant points out that the indictment here only "charged [defendant] with resisting Officer Jonathan Hedges's attempts to detain him, in that he 'did not

follow orders to show his hands and get on the ground.' " According to defendant, these facts, even if proved, cannot support a resisting charge because resistance "is not established by evidence of mere failure to cooperate with police commands." Therefore, defendant argues that the State could not have possibly proved "[defendant's] guilt of the charged crime beyond a reasonable doubt, and his conviction should be reversed." While defendant seemingly acknowledges that other evidence adduced at trial suggested that defendant did *physically* resist his arresting officers by "fighting with [them] and swatting at the [police] dog," defendant argues that the State "bound itself" to the specific allegations in the indictment. In other words, according to defendant, any acts not explicitly set forth in the indictment could not subsequently be used to sustain defendant's conviction.[3] We disagree.

¶ 28     Even if defendant is correct that the indictment did fail to specifically charge defendant with any physical acts of resistance, the State was not precluded from introducing evidence of uncharged acts of physical resistance during defendant's trial. Consequently, because the State introduced evidence of several such acts during trial, a rational trier of fact could find defendant guilty of resisting a peace officer beyond a reasonable doubt.

---

[3] Defendant did not raise this argument before the trial court in a posttrial motion. The State does not assert that defendant forfeited his argument. Regardless, "despite a defendant's failure to file a posttrial motion, we may nevertheless consider constitutional issues, the sufficiency of the evidence, and issues of plain error." *People v. Meakens*, 2021 IL App (2d) 180991, ¶ 12. Here, defendant's argument clearly concerns the sufficiency of the evidence. "Moreover, the State may forfeit or waive an issue of forfeiture as to a defendant's arguments." *Id.* As such, we are not precluded from analyzing defendant's argument.

¶ 29    "The State must prove the essential elements of the charging instrument as alleged and without variance." *People v. Miller*, 253 Ill. App. 3d 1032, 1035-36 (1993). "A fatal variance between the instrument charging a defendant and the proof pursuant to which defendant is convicted at trial requires reversal of the defendant's conviction." *People v. Ligon*, 365 Ill. App. 3d 109, 117 (2006). "For a variance between the charging instrument and the proof at trial to be fatal, the difference 'must be material and be of such character as may mislead the defendant in making his or her defense, or expose the defendant to double jeopardy.' " *People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 67 (quoting *People v. Maggette*, 195 Ill. 2d 336, 351 (2001)). "If the essential elements of an offense are properly charged but the manner in which the offense is committed is incorrectly alleged, the error is one of form." *Id.*

¶ 30    In *Lattimore*, the defendant was charged by indictment with aggravated battery, in that he "struck [the victim, a retail employee,] about the body." *Id.* ¶ 68. However, during trial, it became apparent that the defendant never did strike the victim. *Id.* ¶ 14. Instead, the victim testified that he had grabbed the defendant, and that after the defendant "yanked" away from him, he was thrown off balance and hurtled towards a piece of equipment, injuring his shoulder. *Id.* On appeal, the defendant argued that his conviction should be overturned because the State failed to "introduce evidence that [the] defendant 'struck' [the victim] 'about the body,' " as charged in the indictment. *Id.* ¶ 66. However, the court affirmed, holding:

> "The difference between whether [the] defendant struck [the victim] about the body or caused [the victim] to be struck about the body relates to the manner in which [the] defendant caused bodily harm to [the victim]. [The] [d]efendant has not shown us how a variance between the indictment and the proof on trial about the manner in which this aggravated battery was committed is either material or inadequate notice of the charge.

Therefore, we cannot say that this difference was material." *Id.* ¶ 68.

¶ 31   Here, defendant is correct that the indictment did not specifically allege any physical acts of resistance. *People v. Hilgenberg*, 223 Ill. App. 3d 286, 289 (1991) (finding that a mere refusal to respond to an officer's demands, in the absence of a physical act, does not constitute resistance of a police officer). Instead, the indictment alleged the following:

> "[Defendant] committed the offense of [resisting a peace officer], in that *** [defendant] knowingly resisted the performance of Officer Hedges, of [an] authorized act within his official capacity, being the detainment of []defendant, in that []defendant did not follow orders to show his hands and get on the ground, in violation of [section 31-1(a) of the Code (720 ILCS 5/31-1(a)]."

However, the proof at trial established several uncharged physical acts of resistance that defendant performed over the course of not showing officers his hands: 1) turning away from the officers; 2) walking away from the officers; 3) crouching down on his hands and knees; 4) crawling away from the officers; 5) ducking down towards the Ford Fusion's front passenger tire; and 6) struggling against Officer Bergstrom's canine partner. Any of these uncharged physical acts of resistance—which were described by several officers, recorded, and subsequently shown to the jury—would allow a rational trier of fact to find that defendant knowingly resisted a peace officer beyond a reasonable doubt. However, as these acts were not specifically referenced within the indictment, they are properly categorized as variances from the indictment. See *People v. Arndt*, 351 Ill. App. 3d 505, 518 (2004) (discussing variances between a charging instrument and the proof at trial). Therefore, to determine whether a reasonable trier of fact could have relied upon these variances in finding defendant guilty of the underlying offense, we must first determine whether the variances were material, or in other words, fatal.

¶ 32    We hold that the instant variances were not material, and therefore, were not fatal. The State's introduction of the uncharged physical acts could not have surprised defendant, as the uncharged acts all elaborated upon defendant's alleged resistance as charged in the indictment. As such, the indictment and the variances conform with one another in establishing the same essential element of the underlying offense—defendant's knowing resistance of a peace officer. Otherwise put, like the variances in *Lattimore*, the variances only elaborated upon the *manner* in which the underlying offense was carried out. *Lattimore*, 2011 IL App (1st) 093238, ¶ 67. Indeed, like the defendant in *Lattimore*, defendant has not argued that the variances were material or resulted in inadequate notice of the charge. *Id*. ¶ 68.[4] Consequently, we find that these variances were immaterial. *Id*. Therefore, a rational trier of fact could have relied on the uncharged acts in finding defendant guilty beyond a reasonable doubt of resisting a peace officer. *Id*.

¶ 33    Defendant argues that *Miller* and *People v. Stoudt*, 198 Ill. App. 3d 124 (1990) warrant a different result. We disagree. In *Miller*, the defendant was convicted of obstructing justice, aggravated assault, and battery. 253 Ill. App. 3d at 1032. On appeal, the defendant argued "that the evidence [at trial] was insufficient to sustain beyond a reasonable doubt the conviction of obstructing justice as charged in the complaint." *Id.* There, "[t]he complaint alleged that, *with intent to prevent his 'apprehension,'* " the defendant knowingly furnished false names to a police officer. (Emphasis added.) *Id.* "However, the evidence [at trial] showed that the defendant was

_____

[4] In his reply, defendant only argues—in a conclusory manner—that "the indictment specified [defendant's] acts of resistance and that narrow focus resulted in a similarly narrow defense." However, defendant provides no argument as to how the variances between the indictment and the proof at trial may have prejudiced defense.

already in custody when he gave the false names," meaning he could not have given the false names *in order to prevent his apprehension. Id.* at 1033. As a result, the defendant argued that his conviction should be overturned because "he could not have given false information with the intent to prevent his 'apprehension,' " as charged in the complaint. *Id.*

¶ 34    This court agreed and reversed. *Id.* at 1036-37. In doing so, we noted that, as one of the essential elements of the underlying offense, the State needed to show that the defendant furnished false information "with the intent to prevent the apprehension or obstruct the prosecution or defense of any person." *Id.* at 1035-36. While the charging instrument indicated that the defendant did so by giving false names in order to prevent his apprehension, the evidence at trial varied from the complaint by showing that defendant was already apprehended when he gave the false names. *Id.* No other evidence at trial otherwise established that the defendant furnished false information to avoid apprehension. See *id.* As such, "[t]he State failed to prove beyond a reasonable doubt an essential element of the offense as charged." *Id.* at 1036.

¶ 35    Plainly, *Miller* is distinguishable from the instant matter. There, while the proof at trial did vary from the language of the charging instrument, the resulting variance established that defendant could not have committed the underlying offense, as one who has already been apprehended cannot possibly furnish information to avoid apprehension. *Id.* Here, on the other hand, the instant variances did not negate any essential elements of the offense as charged. Instead, the uncharged physical acts that were described at trial only elaborated upon defendant's refusal to show his hands as originally alleged in the indictment. Therefore, unlike *Miller*, the variances here were not material, as they only pertained to the manner in which defendant carried out the charged offense. *Lattimore*, 2011 IL App (1st) 093238, ¶ 67. Furthermore, our holding in *Miller* was based on the State's failure to prove the essential elements of the underlying offense as

charged. *Miller*, 253 Ill. App. 3d at 1036. We did not engage in any analysis regarding variances. *Id.* As such, *Miller* provides no guidance as to the question of whether the instant variances were fatal. For these reasons, we find *Miller* to be inapt.

¶ 36    Likewise, defendant's reliance on *Stoudt* is misplaced. There, defendant was charged with "resisting or obstructing a police officer," with the amended complaint specifying:

> "Complainant *** charges that on or about April 13, 1988, [the defendant] committed the offense of RESISTING A PEACE OFFICER in violation of Chapter 38, Section 31-1, Illinois Revised Statutes, as amended, in that in De Kalb County, Illinois, said defendant did knowingly refused [*sic*] to remove himself from the 400 block of Lincoln Highway, De Kalb, De Kalb County, Illinois, after being instructed to do so by Sgt. Berke of De Kalb City Police, knowing Sgt. Berke to be a peace officer engaged in the execution of his official duties." 198 Ill. App. 3d at 126-27.

Defendant moved to dismiss the charge, and the circuit court granted his motion. *Id.* at 126. In doing so, the court found:

> " 'The allegation that the [d]efendant stayed on the street after being ordered by the police officer to remove himself/herself does not state the offense of Resisting or Obstructing a Peace Officer pursuant to [section 31-1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1988, ch. 38, §31-1)].
>
> Resistance requires some actual physical act which would impose an obstacle which may impede, hinder, interrupt, prevent or delay the performance of the officers' duties.' " *Id.*

There, the State did not seek to otherwise introduce any evidence of the offense that varied from the allegations of the complaint. *Id.* at 124-28.

¶ 37    On appeal, we affirmed, finding that the complaint was deficient under section 111-3 of the Code of Criminal Procedure of 1963 for insufficiently alleging the elements of the offense, as it did not include any reference to any "performance by a peace officer of an authorized act within his [or her] official authority." *Id.* at 127-28. We further agreed with the trial court in finding that the complaint there did not specify any acts of physical resistance to support the charge of resisting a peace officer. *Id.* at 128.

¶ 38    *Stoudt* bears little relevance to the matters at hand. In *Stoudt,* the defendant argued that the complaint was insufficient under section 111-3 of the Code of Criminal Procedure because it did not set forth the essential elements of the charged offense. *Id.* at 127-28. Our entire analysis in *Stoudt* focused on the sufficiency of the charging instrument; here, by contrast, defendant does not argue that the indictment was insufficient. *Id.* Instead, defendant has expressly stated that "[he] is not challenging the indictment," meaning the sufficiency of the indictment under section 111-3 is not at issue. Instead, the issue here is whether defendant's uncharged acts of physical resistance could nonetheless serve as the basis of defendant's conviction. Consequently, *Stoudt* is of no relevance to us. See *People v. Moman*, 2014 IL App (1st) 130088, ¶ 18 (finding that a complaint's sufficiency under section 111-3 of the Code of Criminal Procedure has no bearing on whether a charging instrument has provided a defendant with sufficient notice of a charged offense). For all of these reasons, we find that the evidence adduced at trial could allow a rational trier of fact to find beyond a reasonable doubt that defendant knowingly resisted a peace officer.

¶ 39                                    B. Jury Instructions

¶ 40    Second, defendant was not deprived of his right to a fair trial by any improper jury instructions. "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law

and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). "Jury instructions should not be misleading or confusing. Their correctness depends not on whether defense counsel can imagine a problematic meaning, but whether ordinary persons acting as jurors would fail to understand them." *Id.* "Whenever Illinois Pattern Jury Instructions, Criminal, contains an instruction applicable in a criminal case *** the IPI Criminal instruction shall be used, unless the court determines that it does not accurately state the law." Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013). "Although the giving of jury instructions is generally reviewed for an abuse of discretion, when the question is whether the jury instructions accurately conveyed to the jury the law applicable to the case, our review is *de novo*." *People v. Pierce*, 226 Ill. 2d 470, 475 (2007).

¶ 41    Here, defendant makes two arguments suggesting that the instant jury instructions—specifically those pertaining to the charge of resisting a peace officer—deprived defendant of his right to a fair trial. First, defendant contends that the instructions were improper because they did not limit the jury's consideration to the specific acts charged in the indictment. Second, defendant argues that the instructions improperly failed to inform the jury that " 'resisting' requires a physical act[,] as opposed to a mere failure to obey commands." Defendant acknowledges that these arguments were not properly raised before the trial court, but contends that, nonetheless, we may review them due to trial counsel's ineffective assistance or as plain error.

¶ 42    Even if we were to assume *in arguendo* that these arguments were not forfeited,[5] we

---

[5] We disagree that trial counsel's alleged ineffectiveness or the plain error doctrine preserve defendant's forfeited arguments. Pursuant to *Strickland v. Washington*, a defendant making a claim of ineffective assistance of counsel must show both deficient performance and prejudice resulting from that deficient performance. 466 U.S. 668, 687 (1984). Plain error may be invoked in two

disagree with defendant's contentions. Here, the trial court was not obligated to instruct the jury that it could only consider the specific acts charged in the indictment when determining whether defendant resisted a peace officer. Furthermore, even if the trial court should have informed the jury of the physical nature of "resisting," defendant was not prejudiced by this theoretical omission. For this reason, any prospective error resulting from the instructions was harmless.

¶ 43                                         1. Specific Acts

¶ 44    First, defendant is incorrect that the trial court was required to inform the jury that it was only to consider the specific acts charged in the indictment while determining whether defendant resisted a peace officer. As we have specified above, "[f]or a variance between the charging instrument and the proof at trial to be fatal, the difference 'must be material and be of such character as may mislead the defendant in making his or her defense, or expose the defendant to double jeopardy.' " *Lattimore*, 2011 IL App (1st) 093238, ¶ 67 (citing *Maggette*, 195 Ill. 2d at 351). Again, the instant variances—consisting of uncharged physical acts of resistance—only detailed the manner in which defendant resisted a peace officer, as originally charged in the indictment. As such, the variances were neither material nor fatal. *Id.* Because the variances were not fatal, the jury could properly consider the uncharged physical acts in determining defendant's

_____

circumstances: "when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Under the first instance of the plain error doctrine, a defendant must also show prejudice. *Id.* Under the second instance, a defendant must show serious error. *Id.* However, as we discuss below, any actual error regarding the jury instructions was harmless. Therefore, defendant can neither show prejudice or serious error as necessary to preserve review of these issues.

guilt. Consequently, there was no basis for the trial court to limit the jury's consideration to the specific acts outlined in the indictment, and defendant's arguments concerning the proper scope of the jury instructions necessarily fails.

¶ 45                                    2. Physical Acts

¶ 46     Next, even if defendant is correct that the jury should have been instructed of the physical nature of "resisting," any resulting error from the trial court's omission was harmless. "Any error, defect, irregularity, or variance which does not affect [a defendant's] substantial rights shall be disregarded." Ill. S. Ct. R. 615(a) (eff. Jul. 1, 2021). An appellate court should not reverse a judgment due to harmless error. *People v. Smith*, 90 Ill. App. 2d 310, 322 (1967). Pursuant to the harmless-error doctrine, an erroneous jury instruction does not require reversal of a trial court's judgment where "the result at trial would not have been different had the proper instruction been given." *People v. Martinez*, 389 Ill. App. 3d 413, 416 (2009).

¶ 47     According to defendant, "[h]ad the jury been properly instructed that resisting requires a physical act—*and had it been informed of what the alleged acts of resistance were*—the jury would have been required to find that no resisting occurred." (Emphasis added.) However, this argument rests on a faulty premise—that the trial court should have limited the jury's considerations to the actions expressly set forth in the indictment. Again, the jury was free to consider the State's evidence of defendant's physical resistance, even if that evidence varied from the allegations contained within the indictment.

¶ 48     As we have analyzed above, the State presented the jury with at least six such physical acts of resistance that defendant engaged in while refusing to show officers his hands. Three officers testified as to these acts, and most of the physical acts were depicted in the video that was subsequently published to the jury. Therefore, even if the jury had been instructed that a "resisting"

charge necessarily requires a physical act, the jury would still have ample evidence of such physical resistance to support a guilty verdict. Consequently, the result of defendant's trial would be no different even if the trial court had instructed the jury of the physical nature of "resisting."

¶ 49　Nonetheless, defendant contends that the State implicitly conceded this point by neglecting to address this specific argument in its response. Defendant argues that, as a result, we should "reverse and remand for a new trial on the basis of that point alone." However, defendant overlooks that we may affirm on any ground supported by the record. *People v. Sanchez*, 2013 IL App (2d) 120445, ¶ 27. Here, the record establishes that any error resulting from the jury instructions was harmless and does not warrant reversal, regardless of the State's silence on the issue.

¶ 50　　　　　　　　　　C. As-Applied Constitutional Challenge

¶ 51　Finally, because the trial court did not hold an evidentiary hearing regarding defendant's as-applied constitutional challenge, we find that the record is insufficient to address defendant's claims.

¶ 52　"All statutes are presumed [to be] constitutional and, where possible, we must construe a statute to uphold its constitutionality." *People v. Johnson*, 2020 IL App (2d) 170646, ¶ 10. An as-applied constitutional challenge requires a showing that a statute is unconstitutional as it applies to "the specific facts and circumstances of the challenging party." *People v. Harris*, 2018 IL 121932, ¶ 38. "All as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge." *Id.* ¶ 39. As such, "a defendant must present an as-applied constitutional challenge to the trial court in order to create a sufficiently developed record." *People v. Holman*, 2017 IL 120655, ¶ 32.

> "A court is not capable of making an 'as applied' determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an

evidentiary record, any finding that a statute is unconstitutional 'as applied' is premature. [Citations.] Nor would it be appropriate for this court, *sua sponte*, to consider whether [a] statute has been constitutionally applied since we, as a reviewing court, are not arbiters of the facts." *People v. Mosley*, 2015 IL 115872, ¶ 47 (citing *In re Parentage of John M.*, 212 Ill.2d 253, 268 (2004)).

"A court may not simply assume that alleged factual matters are true when considering an as-applied constitutional challenge. We reiterate that when a court holds a statute unconstitutional as applied, that holding must be based on an established factual record." *People v. Brown*, 2020 IL 124100, ¶ 34. However, pursuant to our supreme court's holding in *Holman*, a court of review may entertain an "as-applied *Miller* claim for which the record is [already] sufficiently developed for appellate review." 2017 IL 120655, ¶ 32. Still, this is a "very narrow exception." *Id.*

¶ 53    For example, in *People v. Thompson*, 2015 IL 118151, ¶ 39, the defendant (Thompson) first made an as-applied constitutional challenge to his sentence on direct appeal. Specifically, Thompson argued that "the 'evolving science' on juvenile maturity and brain development" forming the basis of the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), should apply to defendants "who are between the ages of 18 and 21." *Id.*, ¶ 38. For this reason, "[under] *Miller*, [Thompson] argue[d] that the sentencing statute that mandated a natural life sentence for his murder convictions [wa]s unconstitutional as applied to him under the eighth amendment because the sentencing statute did not allow the sentencing judge to consider his youth." *Id.* 21.

¶ 54    There, noting that Thompson first made this argument on appeal, our supreme court found that the record contained "nothing about how that science applie[d] to the circumstances of [Thompson's] case," nor "any factual development on the issue of whether the rationale of *Miller*

should be extended beyond [defendants] over the age of 18." *Id.* After remarking that "it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review," the court found that Thompson "forfeited his as-applied challenge to his sentence under *Miller* by raising it for the first time on appeal." *Id.* ¶ 39.

¶ 55    Here, defendant argues that the imposition of the mandatory 15-year firearm enhancement was unconstitutional as-applied to him. Defendant also argues that, despite his failure to preserve the issue before the trial court, *Holman* nonetheless allows us to review his arguments, as the record here is "sufficiently developed to address [defendant's] claim." However, pursuant to *Thompson*, we find that defendant's as-applied challenge is premature.

¶ 56    Like Thompson, defendant first raised his as-applied challenge for the first time on appeal. Both Thompson and defendant have argued that the "developmental characteristics of juvenile brains that informed the Supreme Court's opinion in *Miller*" also apply to young adults. Based on this emerging science, both Thompson and defendant postulate that the lack of discretion in their respective sentencing statutes render their sentences unconstitutional. However, like the record in *Thompson*, the record here contains no factual development tying the science referenced in *Miller* to the facts underlying defendant's case, nor any rationale as to how that science applies to young adults such as defendant. For this reason, like the record in *Thompson*, we find that the instant record is therefore insufficient for us to consider defendant's as-applied constitutional challenge.[6]

_____

[6] We also note that the *Holman* exception to the rule requiring a defendant to first bring an as-applied constitutional challenge before the trial court only pertains to *Miller* challenges—a fact that defendant conveniently omits from his briefs. *Holman*, 2017 IL 120655, ¶ 32. Here, defendant acknowledges that given defendant's age, he is precluded from raising a *Miller* challenge under

As such, we reject defendant's as-applied constitutional challenge as premature.

¶ 57    Citing *People v. Jones*, 2021 IL App (1st) 180996, defendant argues that, even if "further facts are needed to address the emerging research as applied to [defendant], these facts can be explored at resentencing" in the interests of judicial economy. We disagree. In *Jones,* the defendant, who was 19 years old at the time of the offense, was convicted of first-degree murder under an accountability theory. *Id.* ¶ 1. On appeal, the defendant first raised an as-applied constitutional claim against his sentence under both the eight amendment and the proportionate penalties clause of the Illinois constitution. *Id.* ¶¶ 16, 19. There, despite the defendant's failure to first raise the issue before the trial court, the court found that a new sentencing hearing was appropriate "in the interests of judicial economy." *Id.* ¶ 33.

¶ 58    In holding so, the *Jones* court briefly discussed *People v. House*, 2019 IL App (1st) 110580-B, in which the court had previously found that it was able to hear a defendant's as-applied constitutional challenge, even though it was not previously raised before the trial court until the defendant filed his motion to reconsider the defendant's sentence. *Jones,* 2021 IL App (1st) 180996, ¶ 21. The court noted certain similarities between *Jones* and *House:*

"In our case, as in *House*, defendant was 19 years old. [Citation.] In our case, as in *House*,

---

the eighth amendment of the United States Constitution. U.S. Const., amend. VIII. Additionally, because defendant's sentence was not a *de facto* life sentence, his as-applied constitutional challenge cannot properly be characterized as a *Miller* claim. See *People v. Buffer*, 2019 IL 122327, ¶ 42 (holding that sentences that are greater than 40 years qualify as *de facto* life sentences). Therefore, defendant has no basis to argue that the *Holman* exception allows for review of the issue.

defendant was convicted solely under an accountability theory. [Citation.] Although the opinion in *House* stressed that defendant acted solely as a lookout, the *House* defendant was still armed, as was defendant in our case." *Id*. ¶ 32.

The *Jones* court also noted that both there and in *House,* the respective defendants' presentence investigation reports adequately described the defendants' criminal and familial histories. *Id.* ¶¶ 23-24. Therefore, the court found that, "[w]hen one considers the facts and evidence in this case, the finding is inescapable that this case is similar to *House* and requires the same outcome." *Id*. ¶ 18. Given those similarities and "the interests of judicial economy," the court remanded the case for resentencing. *Id*.

¶ 59    *Jones* contradicts our supreme court's longstanding and well-settled precedent; we therefore decline to follow it. As described above, our supreme court has consistently held that an as-applied constitutional challenge must first be brought before the trial court in order to be subject to appellate review. *Thompson*, 2015 IL 118151, ¶ 38; see also *Harris*, 2018 IL 121932, ¶ 39 (defendant's presentence investigation report did not create a sufficient record to analyze defendant's as-applied constitutional claim in lieu of an evidentiary hearing); *People v. Bingham*, 2018 IL 122008, ¶ 22 (the defendant's "improper track" in raising an as-applied due process challenge for the first time on the appeal made it "difficult if not impossible to adjudicate the claim"); *People v. Rizzo*, 2016 IL 118599, ¶ 26 (courts are precluded from making as-applied determinations without the benefit of an evidentiary hearing); *Mosley*, 2015 IL 115872, ¶ 47 (it was "improper" for the court to render a decision on the defendant's as-applied constitutional challenge without the benefit of an evidentiary hearing). It is true that in *House*, the court did consider the defendant's as-applied constitutional challenge, despite the State's argument that the "defendant ha[d] not sufficiently established his as-applied challenge to the proportionate penalties

clause." 2019 IL App (1st) 110580-B, ¶¶ 32, 75. However, since *Jones* was filed and after the State appealed the First District's holding in *House*, our supreme court has considered the case and reversed the portions of the decision considering the defendant's as-applied challenge, finding "that the record in [the] case require[d] further development." *People v. House*, 2021 IL 125124, ¶ 32. As such, the First District's disposition of *House*, which *Jones* expressly relied on, no longer remains to be good law. *Id.*

¶ 60    Aside from its reliance on *House*, a myriad of other details from *Jones* also suggest that the case was wrongly decided. For instance, because the defendant there was 19 years old at the time of the offense, he was precluded from raising a *Miller* claim regarding his sentence. *Id.* ¶ 13; See *People v. Johnson*, 2020 IL App (1st) 171362, ¶ 14 (finding that only juveniles are qualified for protections under *Miller*). Although the *Jones* court found that " 'the record does not need further development before advancing' to a new sentencing hearing,"[7] the court implicitly conceded that the record—as it currently stood—was insufficient for such a task, suggesting that "[a]t a new sentencing hearing, 'both [the] defendant and the State will have the opportunity to fully explore defendant's argument and the evolving science on juvenile brain development.' " *Id.* ¶ 32 (citing *House*, 2019 IL App (1st) 110580-B, ¶ 72). Consequently, the *Holman* exception—

---

[7] The court seemingly believed that the record was sufficiently developed as a result of the defendant's presentence investigation report, which detailed defendant's criminal and familial histories. *Id.* ¶¶ 24-25. However, in *Harris,* our supreme court explicitly found that such a presentence investigation report does not create a sufficient record to address an as-applied constitutional challenge regarding the question of whether "evolving science on juvenile maturity and brain development" applies to young adult defendants. *Harris*, 2018 IL 121932, ¶ 46.

which only applies to *Miller* challenges where the record is adequately developed—could not possibly apply to Jones's challenge. *Holman,* 2017 IL 120655, ¶ 32. For these reasons, the *Jones* court had no basis whatsoever to entertain the defendant's argument, despite any trivial similarities the case shared with *House,* which has since been reversed. Because *Jones* is poorly reasoned and either fails to follow our supreme court's well-settled precedent or persuasively distinguish that precedent, we cannot in good conscience follow it. Thus, we cannot consider defendant's arguments, because they are forfeited due to the inadequately developed factual record.

¶ 61      During oral arguments, defendant sought to evade the conclusion that the instant record—which included no information as to the evolving science on young adults' brain development—was insufficient by claiming that his as-applied constitutional challenge was not dependent on such science. Specifically, at oral arguments, defendant provided that his as-applied challenge did not rely on "*Miller* and its progeny," and instead agreed that his argument was based on "youth in general" and "not a juvenile brain." As such, defendant proposed that this court "did not need to dig into the science" to analyze defendant's challenge, suggesting that the record was therefore sufficient.

¶ 62      Defendant's comments expressly contradict the arguments that he had earlier made in his briefs. For instance, in his opening brief, defendant provides:

>      "Following the proportionate penalties clause's mandate to evaluate sentencing in light of 'evolving standard[s] of decency,' Illinois courts have found it appropriate to evaluate research indicating *that the brains of young adults continue to develop into their mid-20's*. Chief among the scientific findings considered by the courts is a growing consensus *that the same developmental characteristics of juvenile brains* that informed the Supreme Court's opinion in *Miller* persist well into emerging adulthood." (Emphasis

added.) (Internal citations omitted).

Defendant's brief also provides:

> "Along these lines, Illinois courts have recently begun to apply the logic of *Miller* and its progeny to emerging adults facing mandatory adult penalties, concluding that these penalties may violate the proportionate penalties clause as applied to the particular offender."

In the brief, defendant went on to explain that "[t]he same *logic and research* that has caused Illinois courts to treat emerging adults as similar to juveniles has also required close scrutiny of mandatory sentencing statutes." (Emphasis added.) After discussing several cases purportedly employing such logic, defendant concludes that "evolving standards of decency—as shown through case law, legislation, and *research*," confirm the "unfairness *** in cases, like [defendant's], in which the mandatory minimum sentence is drastically increased or even doubled by a firearm enhancement." (Emphasis added.) Most telling, defendant also previously argued that, "[b]ecause of the mandatory sentencing scheme, the trial court was unable to take into account [defendant's] age or *the now established research showing that a young person's neurological development continues well into his 20's*."

¶ 63   Clearly, defendant's as-applied constitutional challenge—as iterated in his briefs—was dependent on the emerging science on young adults' brain development. Although defendant did admittedly make several claims that his age warranted a remand for resentencing, his briefs clearly indicate that such arguments were inextricably tied to the emerging science of young adults' brain development, to which he devoted several pages of argument. As such, defendant cannot now contradict his earlier arguments for the first time during oral arguments. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in

oral argument, or on petition for rehearing"). Furthermore, even if we were to accept defendant's new arguments, by acknowledging that his claims do not rely on "*Miller* and its progeny," defendant cedes that the *Holman* exception does not apply to his as-applied challenge, further establishing the untimeliness of his as-applied challenge. *Holman*, 2017 IL 120655, ¶ 32.

¶ 64    Defendant additionally argues that "if this [c]ourt concludes that the record is insufficiently developed [to consider defendant's constitutional challenge], then this omission is the result of trial counsel's ineffectiveness in failing to develop the record of this claim." As such, without explanation, defendant claims that we may nonetheless review his argument even without a sufficient record to do so.

¶ 65    Defendant's argument is unconvincing. Under *Strickland v. Washington,* 466 U.S. 668, 687 (1984), a party arguing ineffective assistance of counsel must make two separate showings: 1) that counsel's assistance was deficient; and 2) that counsel's deficient performance prejudiced the defense. However, although defendant suggests that his trial counsel should have raised the as-applied challenge before the trial court, defendant paradoxically acknowledges that "counsel was constrained by the mandatory minimum in this case." Of course, counsel's performance cannot be deemed deficient for failing to make an argument that was unsupported by current Illinois law. Indeed, defendant cites no authority providing that trial counsel may be ineffective for specifically failing to challenge the imposition of the *mandatory* sentencing enhancement against a young adult, such as defendant. Nor does defendant cite any cases providing that counsel may be deemed insufficient for failing to advocate a change in the law. For these reasons, defendant's argument is forfeited. Ill. S. Ct. R. 341(h)(1) (eff. Oct. 1, 2020); *People v. Olsson*, 2014 IL App (2d) 131217, ¶ 16. Defendant does suggest that trial counsel should have been aware of cases such as *House*, *People v. Aikens*, 2016 IL App (1st) 133578, and *People v. Barnes*, 2018 IL App (5th) 140378, in

challenging the enhancement, but again, none of these cases involved the imposition of a mandatory sentencing enhancement as applied to a young adult. Because these cases do not support defendant's as-applied challenge, they also do not support defendant's contention that trial counsel should have relied on them.

¶ 66    Perhaps more importantly, defendant provides no explanation as to how trial counsel's alleged ineffectiveness would enable our review in light of the insufficient record. Again, any analysis as to an as-applied constitutional challenge must be based on a fully developed record. *Brown*, 2020 IL 124100, ¶ 34. Even if defendant were hypothetically correct that trial counsel's ineffective performance resulted in the forfeiture of the issue, that fact would do nothing to remedy the insufficient record. For all these reasons, we decline to consider defendant's as-applied constitutional challenge regarding the imposition of the mandatory firearm enhancement.

¶ 67                                    III. CONCLUSION

¶ 68    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 69    Affirmed.